ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EMILIO A. BÁEZ RIVERA<br><br>Recurrente<br><br>v.<br><br>LA INTERLOCKING & GENERAL CONTRACTORS CORP.<br><br>Recurrido | KRA202400491 | *Revisión Judicial* procedente del Departamento de Asuntos al Consumidor<br><br>Querella Núm.: CAG-2023-0005188<br><br>Sobre: Construcción |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 5 de febrero de 2025.

Comparece el Dr. Emilio Báez Rivera (doctor Báez Rivera o Recurrente), mediante un recurso de revisión judicial. Impugna la *Resolución* emitida por el Departamento de Asuntos del Consumidor (DACo) el 9 de julio de 2024, notificada al día siguiente. En el aludido dictamen, el DACo declaró No Ha Lugar la *Querella* interpuesta por el Recurrente contra La Interlocking & General Contractors Corp., del señor Ledy Sáez Ríos (Contratista o Recurrido). En consecuencia, ordenó el cierre y archivo del caso.

Anticipamos la confirmación de la decisión administrativa recurrida.

**I.**

Surge del expediente ante nos que los contendientes suscribieron un Contrato el 18 de enero de 2023 para la construcción de cuatro muros Keystone, a un coste de $343,455.00.[1] El Permiso de Construcción para el proyecto "Casa EAB Renovation", expedido el 28 de abril de 2023 por la Oficina de

---

[1] Apéndice, pág. 13.

Permisos del Municipio Autónomo de Caguas,[2] incluyó las siguientes *Condiciones Especiales*:

1. El arquitecto Edgardo Jorge Ortiz, licencia 22,148, quien es el Inspector Designado para inspeccionar las obras de construcción, deberá cumplir con la Regla 2.7.3 del *Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios* (Reglamento Conjunto).

2. El inspector designado será responsable de presentar informes periódicos del progreso de las obras mensualmente e incluirlos en el sistema como documento del trámite. Los informes deben incluir fotos y detalles de las obras realizadas conforme a lo establecido en la Sección 2.7.3.3 (d) del Reglamento Conjunto. No se expedirá permiso de uso sin esta información.[3]

.    .    .    .    .    .    .    .

Se desprende de los autos que, ya iniciadas las obras de construcción,[4] el Arq. Edgardo Jorge Ortiz (arquitecto Jorge Ortiz o Inspector) cursó una comunicación electrónica al Contratista el 21 de abril de 2023.[5] En ésta le indicó que "las facturas deben pasar a través de mi evaluación para su aprobación final y desembolso". Luego, el 2 de mayo de 2023, el Inspector le aclaró al Recurrido que, una vez enviadas las facturas, las certificaciones de éstas se harían de forma escrita, una vez fueran revisadas y aprobadas para su correspondiente pago.[6]

En el mismo escrito, el Inspector le solicitó al Contratista que suministrara la copia de la póliza de la Corporación del Fondo del Seguro del Estado (CFSE),[7] según incluida en la cotización y en el Contrato.[8] La petición fue reiterada el 17 de mayo de 2023.[9] Al

---

[2] Apéndice, págs. 4-10.

[3] Apéndice, pág. 9.

[4] Las obras de construcción se iniciaron el 29 de marzo de 2023.

[5] Apéndice, pág. 14.

[6] Apéndice, pág. 17, acápite 1. Véase como ejemplo, Apéndice, pág. 18, acápites 7-8 y pág.24.

[7] Apéndice, pág. 17, acápite 4. El Contratista sí proveyó la póliza de responsabilidad pública. Véase, Apéndice, pág. 29.

[8] Véase, inciso (h) del Contrato a la pág. 13 del Apéndice. Además, refiérase al inciso (e) de la Cotización de 7 de noviembre de 2022 a la pág. 12 del Apéndice.

[9] Apéndice, págs. 25-27.

respecto, el Recurrente advirtió que se debía verificar que no hubiera duplicidad de pólizas, toda vez que "todo el proyecto de edificación de la nueva estructura, incluyendo los muros, están cobijados"[10] por la póliza que él adquirió.

El Inspector se comunicó con la CFSE y constató que el Contratista poseía una póliza permanente, aunque no existía un endoso específico para el proyecto "Casa EAB Renovation". No obstante, con la póliza del doctor Báez Rivera, el trabajo de los muros estaba incluido en la cobertura, por lo que el Contratista no tenía que gestionar el referido endoso, ya que no se permitía la duplicidad de pólizas para un mismo proyecto. A esos efectos, el 19 de mayo de 2023, el Inspector envió al Contratista el siguiente correo electrónico:[11]

> Luego de contestarle el correo electr[ó]nico anterior, estuve verificando con la CFSE y la p[ó]liza que obtuvo el Dr. Báez para el proyecto, contempla el trabajo de los muros. No lo dice en la póliza pero s[í] lo dice en el sistema del Fondo. Por tal razón **no va a ser necesario que gestione la certificación de su póliza permanente ya que eso crearía una duplicidad de pólizas que no se debe hacer.** Cualquier duda, me deja saber. (Énfasis nuestro).

Empero, el Inspector requirió al Contratista un crédito a favor del doctor Báez Rivera, toda vez que éste estaba impedido de solicitar un reembolso a la CFSE. "Del cálculo que realizó la [CFSE][12] para ofrecer cobertura al proyecto completo, se desprende que el costo de la inclusión para cobijar el trabajo de los muros de *keystone* representa $8,023.11...". La solicitud de dicho crédito constituyó el primer cambio de orden.[13]

Coetáneamente, los contratantes discreparon en torno a la compra y acarreo del material de relleno. El Contratista cotizó la

---

[10] Apéndice, pág. 20.
[11] Apéndice, pág. 77.
[12] Por conducto de la Lcda. Brenda Marrero Román; véase, *Alegato Suplementario,* pág. 11.
[13] Véase, Apéndice, págs. 31-32; 36; 51-52.

compra de 4,000 metros cúbicos de relleno A-2-4 en $71,705 y la disposición del material inservible en $25,100.00.[14] El 17 de mayo de 2023, el Inspector solicitó al Contratista que suministrara las facturas por la adquisición del material A-2-4. Dijo: "Ese número es necesario para definir la diferencia del cálculo entre material de relleno adquirido y material de relleno reutilizado, que fue extraído del predio".[15] El Inspector sostuvo que el material existente en el predio era adecuado para relleno, tal como surgía del estudio geotécnico de subsuelo realizado por el Ing. José R. Despiau.[16] Reiteró su petición el 29 de mayo de 2023.[17] Advirtió que la negativa a someter la evidencia en o antes de 1 de junio de 2023 equivaldría a la anuencia del Recurrido a que se procediera con el cálculo correspondiente. Para el modelo matemático, el Inspector utilizaría el estudio del subsuelo que afirma la idoneidad del material del predio como relleno, los planos de diseño del muro por el Ing. Jorge L. Morales, la evidencia fotográfica de la obra de construcción[18] y los supuestos dichos del Contratista de que el 2 de mayo de 2023 había recibido los dos primeros camiones del material A-2-4 de una cantera en Guaynabo. "[U]na vez sometidos mis cálculos, no voy a aceptar que presente las facturas como argumento en contra de lo ya finalmente decidido" expresó el Inspector.[19]

Según se consignó en la comunicación de 5 de junio de 2023, el Contratista no entregó las facturas solicitadas.[20] En

---

[14] Véase, Apéndice, págs. 11, incisos (a) y (c); 12, inciso (h); 13, inciso (k).

[15] Apéndice, pág. 26.

[16] Véase Exhibit 14 en la copia certificada del expediente administrativo, *Report for the Geotechnical Investigation for the Proposed Dr. Emilio A. Báez Rivera Residential Dwelling Unit Renovation Project at State Road PR-763, R788 Km. 3.5 in Tomás de Castro Ward of the Municipality of Caguas, Puerto Rico Reference No. DA/21O4092* de 21 de enero de 2022 y realizado por el Ing. José R. Despiau (Lic. 17343).

[17] Apéndice, págs. 31-34.

[18] Véase, Exhibit 15(a)-15m(1) en la copia certificada del expediente administrativo.

[19] Apéndice, págs. 32-33.

[20] Apéndice, págs. 35-38.

consecuencia, el Inspector no certificó la factura 4140 de 15 de mayo de 2023 por la cantidad de $35,721.00.[21] El Inspector indicó que resultaba necesario sustraer de los costes cobrados el relleno proveniente del mismo predio y el acarreo del mismo. En la misiva, se adujo además que el material inservible del corte se distribuyó entre los vecinos del proyecto. A instancia propia, el Inspector calculó que se utilizaron 1,244 metros cúbicos del corte, por lo que el coste de 2,756 metros cúbicos (4,000 – 1,244) de relleno a ser comprado era de $49,404.75 (71,705 x 0.689). Por consiguiente, el Inspector estableció un segundo cambio de orden por un crédito de $22,300.[2]5 a favor del doctor Báez Rivera.

El Contratista no ajustó la factura 4140 según lo intimado por el Inspector. Sin embargo, el 21 de junio de 2023, el Recurrido redujo el importe de la factura 4140 a $29,691.58, pagadero en cinco días laborables, de conformidad con un desglose de créditos parciales (53%).[22] Acreditó $3,943.20 por la póliza de la CFSE, así como $2,096.68 y $1,253.08 por el relleno reutilizado y el acarreo no realizado. Además, el Contratista envió varias facturas y órdenes de la compra del relleno.[23]

En respuesta, el 30 de junio de 2023,[24] el Inspector aseveró que los documentos enviados no eran compatibles con lo que observó el 17 de abril de 2023 ni con las fotografías de la obra, ni con el estudio del subsuelo. "[L]as facturas sometidas de las canteras son incongruentes. Esto crea confusión y dudas. Así que no pueden ser certificadas". Enunció que, de no haberse sometido tardíamente, la única factura a considerar hubiera sido la de Camioneros de Volteo de PR, la cual se ajustaba a sus cálculos. En

---

[21] Apéndice, pág. 102.
[22] Apéndice, págs. 48-49. La obra se ha completado en un 53%. Refiérase al Apéndice, pág. 142, acápite 40.
[23] Apéndice, págs. 39-47.
[24] Apéndice, págs. 50-53. La fecha fue corregida según se desprende de la Transcripción de la Prueba Oral (TPO) 25 de marzo de 2024, págs. 96-97.

la factura aludida se desglosó la compra de 192 y 221 metros cúbicos de relleno A-2-4, entre el 8 y 12 de mayo de 2023. El Inspector expresó: "Basándome en la evidencia revisada, verificada y analizada, puedo concluir, sin lugar a duda, que esa factura representa el total de relleno A-2-4 adquirido por usted en la cantera para completar el trabajo hasta el día de hoy".[25]

Trabada la controversia, el 30 de junio de 2023, el doctor Báez Rivera instó una *Querella* ante el DACo contra el Contratista.[26] Alegó que el Recurrido falló al acuerdo pactado de adquirir una póliza de la CFSE y solicitó el reembolso del monto que sufragó. Imputó que el Contratista facturó un relleno que no compró, así como un acarreo que no se realizó, ya que adujo que el Recurrido reutilizó el material extraído del predio. Como remedio, peticionó el ajuste a la factura 4140, según lo estableció el Inspector.

El 28 de agosto de 2023, el Contratista presentó una *Contestación a Querella*.[27] Indicó que el Inspector lo eximió de la póliza de la CFSE, debido a que el doctor Báez Rivera había obtenido una póliza que cubría el trabajo de los muros. Para ello, refirió al correo electrónico antes citado. Asimismo, negó las imputaciones en su contra concernientes al relleno y su acarreo. Aseveró que sólo utilizó 117.33 metros cúbicos de relleno del predio y que por ello acreditó $2,096.68. Por igual, afirmó que acarreó el material inservible, por lo que podía cobrarlo, según lo estipulado por las partes. El doctor Báez Rivera replicó el 28 de noviembre de 2023.[28]

Así las cosas, la vista administrativa se celebró el 25 de marzo de 2024 y el 16 de mayo de 2024. Prestaron testimonio el arquitecto Jorge Ortiz, el doctor Báez Rivera y el Contratista, señor Ledy Sáez Ríos. Justipreciada la prueba testifical y documental, el DACo

---

[25] Apéndice, pág. 51.
[26] Apéndice, págs. 67-74.
[27] Apéndice, págs. 75-78.
[28] Apéndice, págs. 79-94.

declaró No Ha Lugar la *Querella*.[29] Coligió que, de la prueba presentada, el Recurrente no logró probar por preponderancia de la prueba sus contenciones a satisfacción del juzgador.

En cuanto al crédito por la póliza de la CFSE, el DACo reconoció que el Contratista "se obligó a obtener [...] una póliza del Fondo del Seguro de Estado".[30] No obstante, determinó que el Recurrente relevó al Contratista de su obtención, "puesto que ya contaba con una [póliza] que cubría la totalidad del proyecto que se desarrolla en su propiedad".[31]

Con relación a los costes de relleno y acarreo, a base de la doctrina contractual, el DACo concluyó que el Contratista no violó las disposiciones de nuestro ordenamiento civil, ya que el Recurrente no probó la facturación indebida. Acotó que las facturas, aun con errores y carentes de formalidades, no eran ilegales. Descartó los cálculos del Inspector, ya que en éstos no se consideró la cantidad de rocas de tamaño mayor de cuatro pulgadas, apreciables en las fotografías. Añadió que el Recurrente no aludió a aquella parte del estudio del subsuelo que apuntaba a que los espacios intermedios entre las perforaciones podían diferir de la información contenida en el estudio del subsuelo. Así, el juzgador coligió que no todo el material extraído resultaba óptimo para fines de relleno utilizable en los muros de *keystone*.

.    .    .    .    .    .    .    .

[...] Por lo tanto, para rellenar y compactar los muros correctamente, no se pudo haber utilizado relleno con rocas de tamaño mayor de 4 pulgadas y hubo que comprar y acarrear material, tal como lo indicó el [Contratista].

No hay duda que se utilizó material removido de la propiedad del [Recurrente] como relleno, como tampoco las hay, de que se compró y acarreó material para relleno para ser utilizado en el proyecto de construcción en la propiedad del [Recurrente], a costa del [Contratista]. Sin embargo, de la prueba desfilada, no

---

[29] Apéndice, págs. 137-152.
[30] Apéndice, pág. 138, acápite 6.
[31] Apéndice, pág. 138, acápite 7.

se puede determinar de manera concluyente, cuánto material se compró y acarreó.[32]

.    .    .    .    .    .    .    .

No conteste, el doctor Báez Rivera instó una *Solicitud de Reconsideración.*[33] El 8 de agosto de 2024, con notificación al día siguiente, el DACo declaró No Ha Lugar la petición.[34] Empero, refirió al Recurrido a la *División de Protección al Consumidor* para la imposición de la multa correspondiente,[35] toda vez que La Interlocking & General Contractors Corp. no estaba registrada ante el DACo.[36]

Inconforme, el 4 de septiembre de 2024, el Recurrente acudió ante este foro revisor y esbozó los siguientes errores:

**PRIMER SEÑALAMIENTO DE ERROR**

ERRÓ EL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR EN LA APRECIACIÓN DE LA PRUEBA VERTIDA ANTE DICHA AGENCIA, INCLUSO SUSTITUYENDO EL CRITERIO DE EXPERTOS POR MERAS OBSERVACIONES DEL JUEZ ADMINISTRATIVO, SIN PRUEBA PERICIAL CONTRARIA QUE REFUTARA LA PRUEBA PERICIAL PRESENTADA POR LA PARTE QUERELLANTE-RECURRENTE.

**SEGUNDO SEÑALAMIENTO DE ERROR**

ERRÓ EL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR AL IGNORAR Y MENOSCABAR LA FIGURA DEL INSPECTOR DE OBRA, EN CONTRAVENCIÓN CON EL DERECHO APLICABLE Y LA REGLAMENTACIÓN DE LA OFICINA DE GERENCIA DE PERMISOS (OGPe).

El Contratista presentó *Oposición al Recurso* el 7 de noviembre de 2024. El doctor Báez Rivera sometió un *Alegato Suplementario* el 17 de diciembre de 2024, al que el Recurrido contravino con su respectiva *Oposición* el 13 de enero de 2025.

---

[32] Apéndice, págs. 149-150.

[33] Apéndice, págs. 153-176

[34] Apéndice, págs. 177-178.

[35] Véase, Reglamento Núm. 9377, *Reglamento para la Imposición de Multas Administrativas* de 3 de mayo de 2022.

[36] Véase, Ley Núm. 146 de 10 de agosto de 1995, *Ley de Registro de Contratistas*, 23 LPRA sec. 1020a *et seq.*

Contamos con las comparecencias escritas de las partes, la Transcripción de la Prueba Oral (TPO) de las audiencias celebradas, así como la copia certificada del expediente administrativo. Resolvemos.

**II.**

**A.**

Revisamos la *Resolución* en el caso del epígrafe, al palio de la Ley Núm. 38 de 30 de junio de 2017, *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAUG), 3 LPRA sec. 9601 *et seq.* La Sección 4.5 de la LPAUG, 3 LPRA sec. 9675, que versa sobre el alcance de la revisión judicial, dispone que este tribunal intermedio sostendrá las determinaciones de hechos de las decisiones de las agencias, si se basan en evidencia sustancial que obra en el expediente administrativo. Además, revisará en todos sus aspectos las conclusiones de derecho. En cuanto al remedio, esta curia podrá conceder al recurrente el remedio apropiado si determina que a éste le asiste el derecho. Mediante la revisión judicial, este foro intermedio debe evaluar que la decisión administrativa encuentre apoyo en la evidencia sustancial que obre en la totalidad del expediente administrativo. Por igual, examinamos que el ente gubernamental haya realizado una aplicación o interpretación correcta de las leyes o reglamentos que se le ha encomendado administrar. Finalmente, auscultamos que el organismo haya actuado dentro de los parámetros de su ley habilitadora, no de forma arbitraria, irrazonable ni haya lesionado derechos constitucionales fundamentales. Véase, *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016).

Por lo tanto, al momento de justipreciar la valoración y razonabilidad de las decisiones administrativas adoptadas por las agencias del poder ejecutivo, los tribunales tenemos la obligación de ejercer un juicio independiente de las disposiciones legales para

determinar si una agencia ha actuado o no dentro de los límites de su autoridad estatutaria, incluso en los casos de ambigüedad legislativa. Véase, *Loper Bright Enterprises v. Raimondo,* 144 S.Ct. 2244 (2024); 603 US __ (2024).[37] Claro está, según ha pautado el Tribunal Supremo federal, las interpretaciones y los dictámenes administrativos —realizados por virtud del cumplimiento de un deber oficial y basados en su experiencia especializada— pueden constituir un cuerpo de experiencia y un juicio informado ("body of experience and informed judgment") al que los foros revisores y los litigantes pudiéramos recurrir en cuestiones jurídicas. *Id.,* pág. 2259.

Ahora, el peso persuasivo de la determinación administrativa va a depender de la minuciosidad en su consideración, de la validez de su razonamiento, así como de su congruencia con pronunciamientos anteriores y posteriores. Véase, *Skidmore v. Swift & Co.,* 323 US 134, 139-140 (1944), citado con aprobación en *Loper Bright Enterprises v. Raimondo, supra,* pág. 2259.

**B.**

Es norma firmemente asentada que, en ausencia de pasión, prejuicio, parcialidad o error manifiesto, las determinaciones de hecho, la apreciación de la prueba testifical y las adjudicaciones de credibilidad realizadas por el juzgador merecen deferencia y respeto por parte de los foros apelativos. *S.L.G. Rivera-Pérez v. S.L.G. Díaz-Doe et al.,* 207 DPR 636, 657 (2021); *González Hernández v. González Hernández,* 181 DPR 746, 776 (2011); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013); *Argüello v. Argüello,* 155 DPR 62, 79 (2001); *Trinidad v. Chade,* 153 DPR 280, 291 (2000). En

---

[37] En *Loper Bright Enterprises v. Raimondo, supra,* resuelto el 28 de junio de 2024, el Tribunal Supremo federal revocó la doctrina de deferencia establecida en el caso *Chevron USA, Inc. v. Natural Resources Defense Council,* 467 US 837 (1984). Con ello, además, se propende al fortalecimiento de la separación de poderes. Véase, *Loper Bright Enterprises v. Raimondo, supra,* pág. 2274 (Op. Conc. Juez Thomas).

la revisión de un dictamen en el que desfiló prueba testifical, este tribunal revisor debe conferir la debida deferencia a la apreciación de los hechos efectuada por el juzgador, por ser éste el más idóneo para llevar a cabo esa función. *McConnell v. Palau*, 161 DPR 734, 750 (2004). La determinación de credibilidad del foro sentenciador "es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada ya que él fue quien oyó y vio declarar a los testigos". *Pueblo v. Bonilla Romero,* 120 DPR 92, 111 (1987), citado en *Argüello v. Argüello, supra,* pág. 79. Ello así, porque el juzgador de hechos puede apreciar mejor la forma en que testifican los declarantes, sus comportamientos (*demeanor*) y la totalidad de las circunstancias que acompañan a los testimonios, aspectos que suelen perderse en la letra muda de las actas y expedientes inexpresivos. *Pueblo v. Negrón Ramírez,* 2024 TSPR 41, 213 DPR __ (2024); *Rivera-Pérez v. S.L.G. Díaz-Doe et al., supra,* pág. 658; *S.L.G. Rivera Carrasquillo v. AAA,* 177 DPR 345, 356 (2009); *Sepúlveda v. Depto. de Salud,* 145 DPR 560, 573 (1998); *Ramos Acosta v. Caparra Dairy, Inc.*, 113 DPR 357, 365 (1982); *Ortiz v. Cruz Pabón,* 103 DPR 939, 947 (1975).[38] Por lo anterior, las apreciaciones de la prueba y la credibilidad de los testigos no deben ser sustituidas por las del Tribunal de Apelaciones. *Rolón García y otros v. Charlie Car Rental, Inc.,* 148 DPR 420, 433 (1999). Únicamente, cuando del examen de la prueba se desprenda que el juzgador descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios improbables o imposibles es que se ha justificado nuestra intervención con la

---

[38] Véase, además, la Regla 110 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110, la cual dispone que un testigo que merezca entero crédito es prueba suficiente de cualquier hecho.

apreciación de la prueba realizada por el foro *a quo. C. Brewer P.R., Inc. v. Rodríguez,* 100 DPR 826, 830 (1972).

Claro está, cuando las conclusiones de hecho del foro de instancia estén basadas en prueba pericial o documental, los tribunales revisores nos encontramos en la misma posición que el foro impugnado. *González Hernández v. González Hernández, supra,* pág. 777. Por lo tanto, este tribunal intermedio está facultado para adoptar un criterio propio en la apreciación y evaluación de la prueba documental o pericial. *Mun. de Loíza v. Sucns. Suárez et al.,* 154 DPR 333, 363 (2001); *Prieto v. Maryland Casualty Co.,* 98 DPR 594, 623 (1970). En consecuencia, en el caso de un conflicto irreconciliable entre la prueba testifical y la prueba documental, aquellas determinaciones de hecho basadas en estas últimas pueden ser alteradas. *Díaz García v. Aponte Aponte,* 125 DPR 1, 13-14 (1989).

## C.

En nuestro ordenamiento jurídico, la ley y los contratos son parte de las fuentes de las obligaciones. Art. 1063 del Cód. Civil, 31 LPRA sec. 8984. Un contrato es un "negocio jurídico bilateral por el cual dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones". Art. 1230 del Cód. Civil, 31 LPRA sec. 9751. Es norma asentada que, en cuanto a las obligaciones contractuales, "[l]o acordado en los contratos tiene fuerza de ley entre las partes, ante sus sucesores y ante terceros en la forma que dispone la ley". Art. 1233 del Cód. Civil, 31 LPRA sec. 9754; *Cruz, López v. Casa Bella y otros,* 2024 TSPR 47, 213 DPR __, (2024); *S.L.G. Irizarry v. S.L.G., García,* 155 DPR 713, 725 (2001). "El contrato queda perfeccionado desde que las partes manifiestan su consentimiento sobre el objeto y la causa…". Art. 1237 del Cód. Civil, 31 LPRA sec. 9771.

En lo que atañe al caso del título, por el contrato de obra, "el contratista se obliga, sin estar subordinado al comitente, a realizar una obra material o intelectual por el pago de un precio". Art. 1367 del Cód. Civil, 31 LPRA sec. 10251. El contrato de obra es consensual, bilateral y oneroso. *Master Concrete Corp. v. Fraya, S.E.*, 152 DPR 616, 624 (2000). En general, en este tipo de contrato, una parte se obliga a hacer una cosa y la otra se compele a dar por ella el precio pactado. En específico, el dueño de la obra tiene la obligación de pagar el precio de ésta en la forma, la cuantía y el tiempo acordado. El contratista, por su parte, tiene la obligación de realizar y entregar la obra conforme a lo convenido en el contrato, a las reglas del arte de la construcción y a los usos o las reglas profesionales. *Id.* A menos que se pacte cosa distinta, "el contratista elige libremente los medios y puede valerse, bajo su dirección y responsabilidad, de auxiliares para la ejecución de la obra". Art. 1368 del Cód. Civil, 31 LPRA sec. 10252.

El precio de la obra "se determina por el convenio de las partes...". Art. 1370 del Cód. Civil, 31 LPRA sec. 10261. "La obra puede contratarse por precio alzado, por unidad de medida, por coste o por cualquier otro sistema convenido por las partes". Art. 1371 del Cód. Civil, 31 LPRA sec. 10262. El pago por coste se determina por el valor de los materiales, la mano de obra y los gastos directos o indirectos. Art. 1372 del Cód. Civil, 31 LPRA sec. 10263. Si el precio de la obra se pacta por pieza o medida, los contratantes deben convenir un límite mínimo. Art. 1373 del Cód. Civil, 31 LPRA sec. 10264.

De ordinario, en el contrato de obra, el precio se fija *ab initio*. Antonio García Conesa, *Derecho de la Construcción*, Ed. Bosch, 1996, pág. 181. "Salvo pacto distinto, se presume que la obra se contrata por precio alzado y que es el contratista quien provee los materiales". Art. 1371 del Cód. Civil, *supra.* En la modalidad del

contrato por precio alzado, la naturaleza del acuerdo impone su absoluta certeza en el mismo momento de la perfección. *Id.*

De otro lado, el ordenamiento civilista impone al dueño de la obra o comitente a obligarse a pagar el precio de la obra, proporcionar la colaboración necesaria para que la obra pueda realizarse y a recibir la obra, cuando ésta se ha ejecutado conforme con lo pactado. Art. 1374 del Cód. Civil, 31 LPRA sec. 10271. Por su parte, en armonía con el Art. 1375 del Código Civil, 31 LPRA sec. 10272, las obligaciones del contratista son:

(a) ejecutar la obra según lo convenido y los conocimientos que exige el arte, la ciencia o la técnica correspondiente para la ejecución;

(b) no variar la obra convenida, salvo cuando las modificaciones son necesarias para ejecutarla conforme a las reglas del arte, la ciencia o la técnica que corresponda, siempre que las modificaciones sean imprevisibles en el momento de la contratación;

(c) proveer al comitente la información esencial sobre la ejecución;

(d) comunicar al comitente cualquier variación necesaria y el costo estimado de ésta;

(e) advertir al comitente sobre la mala calidad o inadecuación de los materiales que ha provisto;

(f) aportar, excepto cuando se haya pactado de otro modo, los materiales que se utilizan corrientemente en la ejecución;

(g) ejecutar la obra dentro del tiempo convenido o en el que razonablemente corresponda;

(h) permitir que el comitente, siempre que no perjudique el desarrollo de los trabajos, verifique a su costa el estado de avance, así como la calidad de los materiales utilizados y los trabajos efectuados;

(i) garantizar la solidez de la obra contra la ruina por el término de diez (10) años desde la entrega, cuando esta se ha construido en un inmueble y deba tener larga duración. Igual responsabilidad tendrá el promotor de la obra. El arquitecto responde si la ruina se debe a vicios del suelo o la dirección; y

(j) garantizar que la obra sirve para el destino previsto.

**D.**

La Ley Núm. 161 de 1 de diciembre de 2009, *Ley para la Reforma del Proceso de Permisos de Puerto Rico*, 23 LPRA sec. 9011 *et seq.*, provee el marco jurídico para la solicitud, evaluación,

concesión y denegación de permisos en el Gobierno de Puerto Rico. En lo que compete a la presente causa, el estatuto define al *inspector autorizado* como la "[p]ersona natural que haya sido debidamente certificada y autorizada por la Oficina de Gerencia de Permisos para entender en la inspección [...] o documentos requeridos para la construcción de obras, desarrollo de terrenos, permisos de uso y operación de negocios en Puerto Rico". 23 LPRA sec. 9011(43). En armonía, el *Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios*, de la Junta de Planificación, promulgado el 2 de diciembre de 2020 (Reglamento Núm. 9233),[39] en lo pertinente, establecía lo siguiente sobre la *Certificación de la Inspección de Obras*:

> REGLA 2.7.3 CERTIFICACIÓN DE LA INSPECCIÓN DE OBRAS
>
> SECCIÓN 2.7.3.1 DISPOSICIÓN GENERAL
>
> Todo proyecto de construcción a realizarse a base de un plano certificado conforme a las disposiciones de este Capítulo, estará bajo la supervisión de un Inspector de la Obra de Construcción (IOC) designado por el dueño.
>
> SECCIÓN 2.7.3.2 CERTIFICACIÓN POR EL INSPECTOR DE LA OBRA DE CONSTRUCCIÓN
>
> a. El IOC deberá presentar mediante el sistema electrónico, ante OGPe o el Municipio Autónomo con Jerarquía de la I a la III, a la terminación de la construcción de la obra o etapa de ésta, según aplique, una certificación expresando:
>
>> 1. que la misma fue inspeccionada por él o bajo su supervisión;
>>
>> 2. que cumple con lo expresado en el permiso otorgado a base de los planos certificados; e
>>
>> 3. indicar el valor de la obra según terminada para su uso particular.
>
> b. [...]
>
>> 1. [...]
>>
>> 2. A todos los efectos legales, el IOC es responsable por la inspección de la obra realizada hasta la fecha de radicación de esta certificación.
>
> c. [...]

---

[39] El Reglamento 9233 fue dejado sin efecto por nuestro Tribunal Supremo el 16 de junio de 2023 en el caso *Martínez Fernández et al. v. OGPe et al.,* 212 DPR 285 (2023). No obstante, a la página 290 de la *Opinión*, el alto foro pautó la nulidad de manera prospectiva, por lo que los permisos otorgados con anterioridad, como el de autos, resultan válidos.

d. La certificación del IOC a la terminación de la construcción de la obra o etapa de ésta, según aplique, constituye una obligación impuesta por este Capítulo.

e. Cuando una obra de construcción terminada o cualquier etapa de ésta, según aplique, no cuente con la certificación de inspección requerida luego de ello ser solicitado por un dueño o adquiriente involuntario, la OGPe, a su propia iniciativa o a petición de parte, ordenará al IOC a que emita la correspondiente certificación para la obra.

SECCIÓN 2.7.3.3 FUNCIONES DEL INSPECTOR DE LA OBRA DE CONSTRUCCIÓN

El IOC será responsable de cumplir con lo siguiente:

a. Velar por que la obra sea construida de acuerdo con lo expresado en el permiso otorgado a base de los planos certificados por el proyectista como conformes con las leyes y reglamentos aplicables. Para llevar a cabo esta labor, el inspector podrá utilizar los servicios de otros profesionales y de aquel personal que estime necesario para realizar una labor eficiente.

b. [...]

c. [...]

d. Preparar informes mensuales de las inspecciones de las distintas etapas construidas, los cuales cargará al sistema en línea de la OGPe, para ser incluidas en el expediente de la obra y notificará copia de los mismos al dueño del proyecto.

e. Cada informe contendrá observaciones y comentarios sobre el progreso de la obra de acuerdo con la labor ejecutada para la etapa cubierta por éste y sobre cualquier otro detalle o información que el inspector estime pertinente.

f. [...]

g. Como medida de protección al interés público involucrado en el sistema de certificación de la inspección autorizada de obras implantado por este Reglamento Conjunto, el IOC deberá rendir por lo menos un informe mensual de inspección. Regla 2.7.3. del Reglamento 9233.

.        .        .        .        .        .        .        .

En otro extremo, el Reglamento 9233 definía el término *factura comercial* como "todo documento auténtico que el suplidor en el exterior remita al introductor o consignatario en el cual se describan los artículos remitidos y se refleje el valor de éstos en el mercado". Tomo XII, III. *Glosario de Términos* (F)(9).[40]

---

[40] La Real Academia de la Lengua define "factura" como la "[c]uenta en que se detallan con su precio los artículos vendidos o los servicios realizados y que se entrega al cliente para exigir su pago". Sus sinónimos son: nota, cuenta, recibo,

**III.**

En el caso presente, el Recurrente impugna las siguientes determinaciones de hechos:

7. El Querellante relevó al Querellado de la obtención de la póliza (FSE), puesto que, ya contaba con una que cubría la totalidad del proyecto que se desarrolla en su propiedad.

. . . . . . . .

16. El informe del estudio de suelo aclara que los espacios intermedios entre las perforaciones pueden diferir con la información contenida en el reporte.

. . . . . . . .

19. El Inspector visitó el proyecto que se desarrollaba en la propiedad del Querellante el 17 y el 24 de abril de 2023, días antes de ser formalmente nombrado inspector de la obra de construcción de los muros y casi tres semanas después de haber comenzado el proyecto.

20. La inspección posterior de la obra se realizó desde el estado de Texas, en donde estaba localizado el Inspector, utilizando fotografías que le eran enviadas por el Querellante.

21. Las comunicaciones entre el Inspector y el Querellado luego del 24 de abril de 2023, fueron mediante correos electrónicos y llamadas telefónicas.

. . . . . . . .

23. Una cantidad indeterminada del terreno removido fue reutilizado como relleno.

. . . . . . . .

26. De las fotografías presentadas por el Querellante, las mismas de las que se valió el Inspector para inspeccionar la obra, se pueden apreciar claramente grandes montículos de tierra, los cuales contenían rocas de tamaño considerable.

27. Las referidas fotografías, fueron tomadas por el padre del Querellante y el Querellante en intervalos de días, desde el 29 de marzo de 2023, hasta el 15 de mayo de 2023, mas no se detalló la hora en que fueron tomadas.

28. Las referidas fotografías muestran segmentos del proyecto, pero carecen de una secuencia que permita apreciar la totalidad de la obra y los materiales que había, por cada día que se tomaron.

. . . . . . . .

31. Luego de varios requerimientos por parte del Inspector, el Querellado le envió 8 facturas de compra de material para el relleno del muro.

. . . . . . . .

33. El Inspector alegó, que los números de orden en las facturas no concordaban con las fechas, que los cálculos no eran correctos y que la cantera el Mamey no existía como corporación registrada en el Departamento

---

comprobante, resguardo, extracto, cargo, importe, suma. Refiérase al enlace https://dle.rae.es/factura?m=form.

de Estado de Puerto Rico, por lo que le resultaban sospechosas las referidas facturas.

34. Las referidas facturas no fueron creadas por el Querellado.

.　　.　　.　　.　　.　　.　　.　　.

36. El Inspector recomendó al Querellante no pagar la factura por las cantidades reclamadas por el Querellado por concepto de relleno y acarreo, porque en su opinión, el Querellado reutilizó el material que se extrajo de la propiedad del Querellante para rellenar y compactar, hecho que según el Inspector le consta, porque hay fotografías diarias.

37. El Querellado, además de las referidas facturas, presentó en evidencia, copia de 6 cheques cancelados por concepto de acarreo de material al proyecto del Querellante, los mismos fueron pagados por el Querellado y dos cheques cancelados por concepto de pago de compra de material para el relleno de los muros, los cuales también fueron pagados por el Querellado.

.　　.　　.　　.　　.　　.　　.　　.

39. La obra se detuvo por acuerdo entre las partes, el 15 de mayo de 2023.

.　　.　　.　　.　　.　　.　　.　　.

41. El Querellado le insistió al Querellante que le pagara la factura #4140, la cual el Querellante no pagó por recomendación del Inspector.

42. Por su parte, el Inspector modificó la referida factura basándose en un cálculo matemático, para el cual utilizó las fotos del proyecto que le enviara el Querellante, el por ciento de la labor realizada, cuanto material fue removido y reutilizado como relleno del terreno del Querellante.

43. El Inspector no consideró en sus cálculos el material removido del terreno del Querellante que contenía rocas de más de 4 pulgadas y que no se podía utilizar como relleno, tal como explicó el Querellado.

44. El Querellante, está satisfecho con la labor de construcción realizada por el Querellado hasta el momento y su deseo manifiesto es que continúe los trabajos hasta la culminación de la obra.

Resumimos a continuación la trilogía de testimonios desfilados en las dos sesiones de la vista administrativa, presididas por la Jueza Administrativa Hon. Yasiris Torres Rivera.

### Parte Recurrente

#### *Arq. Edgardo Jorge Ortiz*

El arquitecto Jorge Ortiz enunció que fue designado como inspector del proyecto sito en el Municipio de Caguas, y describió como responsabilidad el "velar porque el proyecto se construya tal y

como fue diseñado, y que se cumpla con las leyes y reglamentos establecidos".[41] La Oficina de Permisos designó al Inspector, por virtud del Permiso de Construcción de 28 de abril de 2023, y es remunerado por el Recurrente.[42] El arquitecto Jorge Ortiz diseño la residencia que se va a construir en el predio, no los muros.[43]

El testigo afirmó que el Ing. Emilio Báez Ramírez, padre del Recurrente, se encargó de tomar las fotografías y se las enviaba.[44] Si bien visitó el proyecto varias veces, al Contratista sólo lo vio una vez, el 17 de abril de 2023.[45] Por igual, apostilló que las fotografías constituían la prueba para asegurar que el cien por ciento de la extracción se reutilizó.[46]

Aludió a las comunicaciones escritas dirigidas al Recurrido, acerca de los requerimientos de la póliza de la CFSE y las facturas de la compra de relleno.[47] En particular, declaró que al Recurrente le favorecía un crédito por el importe total pagado por concepto de la póliza de la CFSE, ya que el Recurrido facturó por ello como parte del Contrato.[48] En cuanto al relleno, testificó sobre la solicitud al Contratista de las facturas de la compra del material para poder certificarlas.[49] Aseveró que necesita corroborar los materiales adquiridos para el informe que debía remitir a la Oficina de Permisos.[50] Acotó que las facturas remitidas no satisficieron la petición, por lo que no aceptó los documentos.[51] "Él envió una factura de una cantera en Bayamón, unos recibos genéricos y una

---

[41] TPO 25 de marzo de 2024, págs. 11 líneas 3-12; 14 líneas 6-10.
[42] TPO 25 de marzo de 2024, págs. 33-35.
[43] TPO 25 de marzo de 2024, pág. 145 líneas 23-25.
[44] TPO 25 de marzo de 2024, págs. 52 líneas 18-24; 130 líneas 10-16; 131 líneas 3-9.
[45] TPO 25 de marzo de 2024, págs. 146 líneas 13-19; 162 líneas 20-25; 184 líneas 16-20.
[46] TPO 25 de marzo de 2024, pág. 162 líneas 10-17.
[47] TPO 25 de marzo de 2024, págs. 25-29.
[48] TPO 25 de merzo de 2024, págs. 30-32; 43.
[49] TPO 25 de marzo de 2024, pág. 47.
[50] TPO 25 de marzo de 2024, pág. 92 líneas 9-18.
[51] TPO 25 de marzo de 2024, págs. 60; 61 líneas 1-3; 99 líneas 15-23.

factura de una cantera en Gurabo, que se llama Camioneros de Volteo".[52] Distinguió la factura de Camioneros de Volteo de las otras por el contenido del material vendido y la fecha de 8-12 de mayo de 2023.[53] Además, declaró que intercambió mensajes de texto con el Sr. Roberto Betancourt, presidente de la cantera Rok-Mar Corp. La cantera emitió una factura fechada el 29 de marzo de 2023. Testificó que el señor Betancourt le dijo que no conocía el área y le dio unos precios que no coincidían con los de la factura.[54] Acerca de las otras facturas, el Inspector las describió como "unos recibos de una libreta genérica", con errores matemáticos y carente de formalidades, como la dirección y el teléfono del suplidor. Sostuvo que la Cantera El Mamey no existía y que el Contratista se la inventó.[55] "Yo llamé al Departamento de Estado y me dijeron que no existía. No hay certificado de incorporación, no existe".[56] Luego, manifestó que la cantera no estaba registrada como corporación.[57] En fin, al entender que no contaba con información fidedigna, no certificó la factura 4140 de 15 de mayo de 2023, ni la enmendada posteriormente, por lo que el pago no podía ser realizado.[58]

Sostuvo que el Contratista reutilizó el relleno del predio extraído de la excavación y que requería de evidencia del material comprado.[59]

> Sí, me consta. Y me consta, porque hay fotografías diarias del movimiento de terreno en el solar, del predio. Yo visité el predio en un momento dado, y le pregunté al señor Sáez si había adquirido material, y él indicó que no había sido necesario porque estaba reutilizando el material de la extracción, de la excavación.[60]
>
> .    .    .    .    .    .    .    .

---

[52] TPO 25 de marzo de 2024, pág. 75 líneas 7-13.
[53] TPO 25 de marzo de 2024, pág. 78.
[54] TPO 25 de marzo de 2024, págs. 83-86.
[55] TPO 25 de marzo de 2024, págs. 87-89.
[56] TPO 25 de marzo de 2024, pág. 89 líneas 17-20.
[57] TPO 25 de marzo de 2024, págs. 170 líneas 19-23; 171 líneas 21-25; 172 líneas 1-3.
[58] TPO 25 de marzo de 2024, pág. 91 líneas 4-7. Además, págs. 117 líneas 20-25; 118 líneas 1-2; 172 líneas 6-9.
[59] TPO 25 de marzo de 2024, pág. 48.
[60] TPO 25 de marzo de 2024, pág. 51 líneas 1-8.

> Mi apreciación es, que el análisis que yo pude realizar acerca del desarrollo del proyecto era correcto, de que no se había adquirido material de relleno y que se había reutilizado el material de extracción en el área del proyecto.[61]
>
> .     .     .     .     .     .     .     .
>
> Basado en la información provista por las fotos, se puede concluir que el material extraído... pude concluir que el material extraído fue almacenado en el predio, y a medida que se va viendo el desarrollo del proyecto se puede ir viendo cómo el material [Interrupción de audio]. Hay diferentes [Interrupción de audio] diferentes fechas de cada día, y en un momento dado se percibe que hay un material de color distinto. Y ese es el momento en que nosotros entendemos que se adquirió algún material que fue acarreado hasta el proyecto.[62]

El Inspector apuntó a que había dos colores de material en las fotos de 2, 3, 4, 7, 9, 10 y 12 de mayo de 2023 que, en comparación con otro montículo, no correspondían al predio.[63] "Por lo tanto, fue de ese momento en adelante que nosotros entendemos que hubo adquisición de material y que llegó al proyecto".[64] Se refirió también al estudio del subsuelo, el cual indicaba que el terreno era óptimo para ser utilizado como relleno.[65] Expresó que, ante la falta de acreditación, calculó los materiales utilizados, a base del diseño del ingeniero Morales, ya que era su responsabilidad asegurarse que el proyecto se realizara conforme el presupuesto.[66] "[Y]o no tengo manera de constatar la cantidad de material que él adquirió, si no provee esa información. Pero yo puedo sí calcular cuánto material se extrajo, porque en el diseño del ingeniero Morales se define cuáles son las dimensiones de las excavaciones".[67] El Inspector utilizó el teorema de Pitágoras para sus cálculos.[68] Luego del ejercicio matemático, computó que se extrajeron 2,447 metros cúbicos de material, de los cuales 1,244 metros cúbicos fueron reutilizados

---

[61] TPO 25 de marzo de 2024, pág. 103 líneas 3-8.
[62] TPO 25 de marzo de 2024, págs. 135 líneas 14-25; 136 línea 1.
[63] TPO 25 de marzo de 2024, págs. 136 líneas 5-12; 138-141.
[64] TPO 25 de marzo de 2024, pág. 137 líneas 23-25.
[65] TPO 25 de marzo de 2024, pág. 111 líneas 6-11.
[66] TPO 25 de marzo de 2024, págs. 118 líneas 10-15; 120 líneas 16-23.
[67] TPO 25 de marzo de 2024, pág. 121 líneas 19-25.
[68] TPO 25 de marzo de 2024, pág. 122 líneas 7-10.

como relleno. A esos fines, concluyó que la factura 4041 debía ser por $11,481.28.[69]

### *Dr. Emilio Báez Rivera*

El Recurrente expuso que es dueño del proyecto de construcción de una casa, diseñada por el arquitecto Jorge Ortiz, y un muro de contención, diseñado por el ingeniero Morales.[70] Con relación a lo pactado, explicó que las cotizaciones de $118,205.00 y $225,250.00 de 7 de noviembre de 2022 se fusionaron para establecer el precio total de $343,455.00 del Contrato.[71] El relleno A-2-4 se cotizó a $71,705.00 correspondiente a cuatro mil metros cúbicos.[72] La disposición de material inservible se cotizó en $25,100.00.[73]

El Recurrente atestiguó que fue él quien tomó las fotografías del proyecto, dirigido por su padre, el Ing. Emilio Báez Ramírez, y las remitió al Inspector, según solicitadas por este último.[74] Luego de relacionar los pagos realizados para un total de $155,988.24, el Recurrente indicó que la controversia con el Contratista surgió por la factura 4140 de 15 de mayo de 2023, posteriormente enmendada, que todavía no ha pagado.[75]

En torno a la suspensión de los trabajos desde mayo de 2023, cuestionado por la Jueza Administrativa, el doctor Báez Rivera dijo que se debió a un acuerdo de seis meses con el Recurrido, ya que éste realizaría otro trabajo. Aclaró el testigo que el término convenido ya había expirado en noviembre de 2023 y el Contratista no se había

---

[69] TPO 25 de marzo de 2024, págs. 123 líneas 8-16; 179 líneas 11-19.
[70] TPO 25 de marzo de 2024, págs. 190-191.
[71] TPO 25 de marzo de 2024, págs. 196-197.
[72] TPO 25 de marzo de 2024, pág. 213 líneas 15-21.
[73] TPO 25 de marzo de 2024, pág. 237 líneas 11-12.
[74] TPO 25 de marzo de 2024, págs. 197 líneas 20-23; 198 líneas 1-20.
[75] TPO 25 de marzo de 2024, págs. 199-205; 207 líneas 8-22. Véase, Apéndice, págs. 55; 97-104.

presentado ya que "estábamos en la controversia".[76] De hecho, manifestó su interés de continuar trabajando con el Contratista.[77]

El testigo acotó que le interesaba pagar por el relleno que realmente se compró; esto, según los cálculos del Inspector.[78] El Recurrente comparó la cotización del Recurrido con la factura de Rok-Mar Corp. y encontró que era menos, por lo que la diferencia debía justificarse.[79] En cuanto al acarreo, ripostó que el Contratista regaló el material a los vecinos, en lugar de llevarlo a una cantera en Guaynabo como indicó inicialmente.[80] Dijo que el Recurrido nunca explicó por qué no utilizó dicha cantera y adquirió el relleno en otra.[81] También negó que el Contratista le indicara que el material extraído del corte no servía como relleno.[82]

> Entonces, de los $71,705.00, pues, si realmente lo que se acarreó al proyecto fueron 413 metros cúbicos, pues eso es lo que se debe de pagar. Él tiene una factura de Camioneros de Volteo de Gurabo, que es durante el periodo de tiempo del proyecto que él empieza a traer material, coincide del 8 al 12 de mayo, por la cantidad de 413 metros cúbicos.
>
> De hecho, demuestra que se le facturaron dos entregas. Y cuando vamos a revisar el color del material, hay una entrega de un material marrón primero, y después hay un material azul. O sea, que se confirma que hubo dos entregas. Y previo a eso, las fotos demuestran que todo el relleno que se utilizó es del mismo color del predio. Y cuando yo hablé con él el 2 de mayo...[83]
>
> .    .    .    .    .    .    .    .
>
> De hecho, él estuvo utilizando material del corte hasta el último día, y eso lo demuestran las fotos. Pero obviamente, una cantidad mínima. Así que, una vez él decide comprar el material, que él lo dialoga conmigo y me dice: "A partir de hoy empiezo a traer material"... Yo veo allí, y, de hecho, las fotos lo demuestran, que el material reutilizable del corte ya se estaba acabando, pues, él lo manda a comprar y en esa misma semana empieza a recibirlo.[84]

---

[76] TPO 25 de marzo de 2024, págs. 208-210; 261 líneas 15-22.

[77] TPO 25 de marzo de 2024, pág. 233 líneas 1-7.

[78] TPO 25 de marzo de 2024, págs. 210 líneas 20-25; 211 líneas 1-9.

[79] TPO 25 de marzo de 2024, págs. 216 líneas 18-25; 217 líneas 1-8.

[80] TPO 25 de marzo de 2024, pág. 224 líneas 23-25.

[81] TPO 25 de marzo de 2024, pág. 255.

[82] TPO 25 de marzo de 2024, pág. 257.

[83] TPO 25 de marzo de 2024, pág. 218 líneas 9-25.

[84] TPO 25 de marzo de 2024, pág. 229 líneas 6-16.

A preguntas de la Jueza Administrativa, el Recurrente aseguró que, desde el primer día, vio que se estaba reutilizando el material del corte, pero no solicitó el crédito porque le parecía obvio.[85] Afirmó que el color rojizo era el relleno del corte; y que éste era cien por ciento utilizable, de conformidad con el estudio del subsuelo, por lo que no se le podía cobrar.[86] Según él, el relleno marrón y azul correspondía al material de Camioneros de Volteo. La diferencia de los colores y su atribución surgían de su propia observación.[87] Indicó también que, el 2 de mayo de 2023, el Recurrido le informó que comenzaba a recibir relleno, lo cual coincidía con la factura de Camioneros de Volteo y con el cálculo original que hizo el Inspector.[88] "El arquitecto Jorge recomendó que se pagara a $3.00 el metro cúbico acarreado y que pagáramos $5.50 por metro cúbico acarreado de Camioneros de Volteo del proyecto, porque Camioneros de Volteo vendió el material pero no lo acarreó", sino que lo hizo el Recurrido.[89] El doctor Báez Rivera enunció que pagaría por lo que entendía y sabía que se compró, según las fotografías.[90]

Como remedio, solicitó un ajuste del precio porque la disposición del material se estaba llevando a una propiedad vecinal.[91] Además, peticionó una enmienda al Contrato para él encargarse directamente de la compra y acarreo del relleno.[92] Por ende, consignó que se le acreditaran $45,641.21.[93] Esta suma no incluía la reclamación relacionada con la CFSE. Sobre ésta, el doctor Báez Rivera dijo que "eso está adjudicado, y se negoció".[94]

---

[85] TPO 25 de marzo de 2024, págs. 229 líneas 17-25; 230 líneas 1-2.
[86] TPO 25 de marzo de 2024, págs. 221 líneas 1-4; 222 líneas 6-17.
[87] TPO 25 de marzo de 2024, pág. 258.
[88] TPO 25 de marzo de 2024, págs. 219-220.
[89] TPO 25 de marzo de 2024, pág. 225 líneas 3-24.
[90] TPO 25 de marzo de 2024, pág. 226 líneas 16-19.
[91] TPO 25 de marzo de 2024, págs. 227-228.
[92] TPO 25 de marzo de 2024, pág. 232 líneas 18-23.
[93] TPO 25 de marzo de 2024, págs. 239-247. ($32,938.21 + $12,703.00 = $45,641.21)
[94] TPO 25 de marzo de 2024, págs. 232 líneas 9-11; 247 líneas 16-19.

**Parte Recurrida**

*Ledy Sáez Ríos*

El Contratista tiene sobre 25 años de experiencia en la construcción, incluyendo la edificación de muros de *keystone*.[95] Indicó que el ingeniero Morales realizó el diseño del muro y que, a base de éste, realizó su cotización,[96] ya que el diseño incluía los cómputos de los materiales.[97] En este caso en particular, las propuestas de cotización admitidas en evidencia se remontaron al 7 de noviembre de 2022.[98] El Contrato, por su parte, fue suscrito el 18 de enero de 2023,[99] y ascendió a $300,000.00. Los $43,455.00 abonados por el Recurrente se destinaron a la compra de las mallas, las cuales el Contratista ubicó en su taller, por temor a que las robaran.[100] Apuntó que el Recurrente aceptó todos los términos del Contrato.[101]

Con relación a la facturación, el Recurrido aseguró que lo que facturaba semanalmente era mucho menos que la producción.[102] En lo que atañe, enunció que nunca se le pagó la factura 4140 de 15 de mayo de 2023, por $35,721.00, debido a que hubo objeciones relacionadas con el relleno. A ese momento, se había completado un 53% de la obra.[103] Aclaró el testigo que, el 21 de junio de 2023, concedió un crédito al Recurrente por $7,292.96, en concepto del 53%, tanto de la póliza de la CFSE como del material reutilizado. Acotó que dicho balance tampoco se le había satisfecho.[104]

En torno a la controversia del relleno, el Contratista declaró:

---

[95] TPO 25 de marzo de 2024, pág. 266 líneas 16-25. TPO 16 de mayo de 2024, pág. 7 líneas 22-25.
[96] TPO 25 de marzo de 2024, págs. 266 líneas 16-25; 267 líneas 13-19.
[97] TPO 25 de marzo de 2024, pág. 269 líneas 2-4.
[98] TPO 16 de mayo de 2024, pág. 9 líneas 18-24; 10 líneas 1-2.
[99] TPO 16 de mayo de 2024, pág. 11 líneas 1-2.
[100] TPO 25 de marzo de 2024, págs. 269 líneas 8-17; 284 líneas 4-10.
[101] TPO 16 de mayo de 2024, pág. 10 líneas 9-10.
[102] TPO 25 de cnarzo de 2024, págs. 276 líneas 22-25; 277 línea 1.
[103] TPO 25 de marzo de 2024, págs. 289 líneas 9-18; 290 líneas 12-19; 291 líneas 17-25; 292 líneas 1-3; 293 líneas 1-2.
[104] TPO 25 de marzo de 2024, págs. 293-294.

P. Okey. Entonces, vamos ahora al otro aspecto, la cuestión del relleno del lugar. Dígale a la Honorable Juez[a] la extracción, ¿qué pasaba con eso?

R. Cuando comenzamos con la extracción, el material era rocoso, muy rocoso, y el material rocoso no se puede utilizar. El A-2-4 hay mucha... hay clasificación A-2-4, pero el A-2-4 sirve para todas las áreas. Los muros de nosotros como tal, tiene que ser bien específico, porque si hay piedras de más de cuatro pulgadas, parten la malla, y si parten la malla el muro por consiguiente va a fallar. Y eso fue lo que ocurrió allí. Eso fue lo que ocurrió allí. Desde el primer día le comenté al doctor: "Doctor, este material hay que...". Inclusive, ya yo sabía... ya mi contrato decía que yo tenía que disponer de él. Pero si yo veo que el material funciona, pues, yo le puedo hacer una recomendación y hacemos un ajuste. Pero desde el primer día que comenzamos era rocoso, demasiado rocoso. No funciona, y se lo dije. Llamé... inclusive, llamé al [Interrupción de audio].

HONORABLE JUEZ[A]
Pero, ¿y qué ustedes habían acordado [Interrupción de audio], que usted iba a comprar todo el material?

R. [...] Sí, yo iba a comprar todo el material. [Y] yo lo hice.[105]

El Recurrido afirmó que la especificación de que el relleno para el muro no tuviera rocas mayores de cuatro pulgadas era innegociable. Aun cuando el Contrato no lo consignaba, dijo que las directrices surgían de lo conversado y aprendido a través de la relación de 25 años con el ingeniero Morales.[106] "Él es el que da las especificaciones...".[107] El Recurrido reiteró que el material no se podía utilizar porque era rocoso; tenía "rocas de más de cuatro pulgadas, y al compactar con la máquina que se compacta, que es un rolo de los grandes, cuando da rompe la malla, y el muro al par de años va a fallar". Así aseguró que se lo comunicó al Recurrente.[108] "Doctor, el relleno no funciona porque tiene piedra de más de cuatro pulgadas y nos va a romper la malla, el muro va a fallar".[109]

---

[105] TPO 25 de marzo de 2024, págs. 297 líneas 13-25; 298 líneas 1-17. Véase, TPO 16 de mayo de 2024, pág. 20 líneas 12-20.
[106] TPO 16 de mayo de 2024, págs. 20 líneas 22-25; 25 líneas 6-21; 26 líneas 5-7; 28-29.
[107] TPO 16 de mayo de 2024, pág. 26 línea 2.
[108] TPO 25 de marzo de 2024, pág. 299 líneas 1-10. Además, TPO 16 de mayo de 2024, págs. 56-57.
[109] TPO 16 de mayo de 2024, pág. 169 líneas 4-7.

Acerca del tipo de suelo del predio, el Contratista aseveró que "[n]o hay una constante de que el material sea el mismo".[110] Explicó que el material reutilizado del predio que no contenía rocas se sustrajo de la primera capa.[111] Agregó que el material extraído pudiera funcionar para un muro de contención, pero no para un muro de bloque sedimentado, porque eran muy diferentes.[112]

Sobre los colores del material, sostuvo que la cantera suplió relleno de diferentes colores.[113] En cuanto al material del predio, dijo:

P. ¿De qué color era el relleno que se estaba sacando?

R. El color... el relleno cambia. El relleno es... el relleno, usted puede tener un corte de relleno a dos pies de un color y cuando cambia más abajo tiene otro color. Eso cambia. Y puede hacer un *boring* [barreno] aquí y un *boring* [barreno] acá, y el relleno...[114]

.　　.　　.　　.　　.　　.　　.　　.

Para ver la clasificación del relleno. Y otro acá, y le da un A-2-4. Y en el medio puede pasar, que no es el material.

HONORABLE JUEZ[A]:
¿Y qué es un A-2-4?

R. El material selecto para... que es el material filtrante. Es un A-2-4. Y le puede dar, se hace un *boring* [barreno] a 50 pies en el medio usted no sabe... está asumiendo. Eso se está asumiendo de que es el mismo material, pero no necesariamente...[115]

Así pues, el testigo declaró que utilizó alrededor de 117 metros cúbicos para relleno y el resto del material lo desechó porque no servía. De esa cantidad de material correspondió el crédito concedido en la factura 4140 enmendada el 21 de junio de 2023.[116]

---

[110] TPO 25 de marzo de 2024, pág. 305 líneas 5-6.
[111] TPO 16 de mayo de 2024, págs. 59; 60 líneas 1-8.
[112] TPO 16 de mayo de 2024, pág. 162 líneas 11-13.
[113] TPO 25 de marzo de 2024, págs. 306; 307 líneas 2-5.
[114] TPO 25 de marzo de 2024, pág. 299 líneas 11-20. Además, TPO 16 de mayo de 2024, pág. 55.
[115] TPO 25 de marzo de 2024, pág. 300 líneas 3-14.
[116] TPO 25 de marzo de 2024, págs. 300 línea 24; 303 líneas 1-5; 303 líneas 3-5. TPO 16 de mayo de 2024, págs. 44-45; 46 líneas 1-2; 52-53.

Admitió el Recurrido que, si bien sabía que antes de un proyecto se realiza un estudio del subsuelo, en este caso, no vio el reporte.[117]

Añadió que "[c]uando el arquitecto llega, que llega el 17 de abril, creo que fue que llegó, ya el corte se había hecho. Ya ese corte estaba hecho, ya allí no quedaba relleno".[118] Apostilló que, para esa ocasión, el proyecto llevaba dos semanas de iniciado y que el Inspector no bajó al área del corte. "[N]unca más lo volví a ver", sino que el declarante se mantuvo trabajando solo. La comunicación se realizó mediante correos electrónicos desde Texas.[119] Asimismo, indicó que, a base de su conocimiento y experiencia, determinó qué material utilizar y descartar, lo que notificó al Recurrente; no al Inspector porque "el arquitecto no estaba" en el proyecto como se supone.[120]

En torno a la facturación, el Recurrido reconoció que las órdenes de compra carecían de un encabezado preimpreso y fueron completadas a manuscrito. Además, algunos cálculos presentaban errores. El recurrido indicó que él no fue quien las preparó, que no todas las canteras funcionaban de la misma manera y que tampoco llevaba una bitácora.[121] Dijo que, desde principios del proyecto, estaba comprando relleno; y que si las facturas no coincidían con las fechas de entrega era porque "[e]l relleno me lo pueden entregar tres semanas después o dos semanas después, cuando yo lo pida".[122] Añadió que, aun cuando no presentó en evidencia todos los cheques, sí estaban pagados.[123]

---

[117] TPO 16 de mayo de 2024, págs. 126 líneas 8-14; 127 líneas 2-4; 162 líneas 1-5.
[118] TPO 25 de marzo de 2024, pág. 304 líneas 20-23. TPO 16 de mayo de 2024, pág. 37 líneas 19-25.
[119] TPO 25 de marzo de 2024, pág. 309 líneas 11-25. TPO 16 de mayo de 2024, pág. 34 líneas 19-23; 36 líneas 1-11; 39 líneas 5-13.
[120] TPO 16 de mayo de 2024, págs. 158; 165-166; 170.
[121] TPO 16 de mayo de 2024, págs. 135-137; 163 líneas 8-14. Además, TPO 16 de mayo de 2024, págs. 138-144.
[122] TPO 16 de mayo de 2024, págs. 157 líneas 24-25; 158 línea 1.
[123] TPO 16 de mayo de 2024, pág. 153.

En el procedimiento administrativo se admitieron las siguientes facturas por la compra del relleno A-2-4:[124]

| Suplidor | Factura u Orden de Compra | Fecha | Cantidad |
|---|---|---|---|
| RokMar Corp. | 5279 | 29/3/2023 | $4,477.26 Relleno Acarreo |
| Cantera El Mamey (manuscrito) | 0153166 Proyecto Dr. Báez | 26/4/2023 | $981.00 Relleno |
| Cantera Gurabo[125] (manuscrito) | 0153151 Proyecto Dr. Báez | 27/4/2023 | $981.00 Relleno |
| Cantera El Mamey (manuscrito) | 0153169 Proyecto Dr. Báez | 2/5/2023 | $802.50 Relleno |
| Cantera El Mamey (manuscrito) | 0153156 Proyecto Dr. Báez | 3/5/2023 | $883.08 Relleno |
| Cantera El Mamey (manuscrito) | 0153157 Proyecto Dr. Báez | 4/5/2023 | $2,350.00 Relleno |
| Cantera El Mamey (manuscrito) | 0153165 Proyecto Dr. Báez | 5/5/2023 | $1,894.94 Relleno |
| Camioneros de Volteo de PR | 2023-001 Proyecto Dr. Báez | 8-12/5/2023 | $2,532.72 Relleno |

En cuanto al acarreo, el Recurrido aseveró que removió el material y lo distribuyó entre los vecinos con el consentimiento de éstos.[126] Sobre los importes pagados, el Recurrido aclaró que "los troqueros no nos dan las facturas".[127] Se admitieron en evidencia los cheques que el Contratista pagó por el acarreo a los transportistas:[128]

---

[124] TPO 16 de mayo de 2024, págs. 75-87. Véase, cheque 2701 de 5 de mayo de 2023 por $2,350.00 pagadero a José Díaz; Apéndice, pág. 108. Además, cheque 2685 de 10 de mayo de 2023 por $1,230.00 pagadero a José Díaz y cheque 2672 de 28 de abril de 2023 por $981.00 pagadero a Soheidi Marie Barbosa; Apéndice, págs. 111 y 114.

[125] Las canteras Gurabo y El Mamey son las mismas. TPO 16 de mayo de 2024, pág. 140 líneas 14-20.

[126] TPO 16 de mayo de 2024, págs. 42-44.

[127] TPO 16 de mayo de 2024, pág. 147 líneas 3-6.

[128] TPO 16 de mayo de 2024, págs. 89-96; 145-148. En la vista se aludió a un cheque por el acarreo de arena que no correspondía al proyecto del Recurrente, según las propias declaraciones del Recurrido. Apéndice, pág. 105; TPO 16 de mayo de 2024, págs. 88-89.

| Cheque | Fecha | Nombre | Cantidad |
|---|---|---|---|
| 2674 | 23/4/2023 | Pedro Hernández | $1,500.00 Acarreo |
| 2701 | 5/5/2023 | José Hernández | $1,350.00 Acarreo |
| 2700 | 5/5/2023 | Pedro Hernández | $1,950.00 Acarreo |
| 2699 | 5/5/2023 | Jan Carlo Hernández | $900.00 Acarreo |
| 2698 | 11/5/2023 Proyecto Dr. Báez | Jan Carlo Hernández | $2,250.00 Acarreo |
| 2707 | 12/5/2023 | Pedro Hernández | $1,950.00 Acarreo |

Del mismo modo, se recibió como evidencia el desglose de créditos que el Contratita confirió al Recurrente el 21 de junio de 2023. Se tomó en consideración que la obra se detuvo a un 53% de completada.[129]

De otro lado, relacionado con la contención de la póliza de la CFSE, el Contratista atestiguó que el Recurrente le indicó que "no sacara la póliza del Fondo todavía, porque él entendía que [...] los muros estaban incluidos en la póliza que él sacó...".[130] Dijo que le acreditó el 53% de la póliza, afín al proyecto detenido.[131] Entonces, declaró sobre el correo electrónico en el que le instruyeron a no sacar la póliza para evitar la duplicidad.[132] Sin embargo, el Contratista mantuvo el ofrecimiento del crédito.[133]

**IV.**

En la presente causa, el doctor Báez Rivera alega que el DACo incidió en la apreciación de la prueba vertida. Indica que el juzgador sustituyó el criterio experto no refutado por sus "meras observaciones". Aduce también que el DACo erró al ignorar la figura del Inspector, en contravención del derecho aplicable. No nos persuade.

---

[129] TPO 16 de mayo de 2024, págs. 97-100.
[130] TPO 16 de mayo de 2024, pág. 13 líneas 8-12.
[131] TPO 16 de mayo de 2024, pág. 16 líneas 1-5.
[132] TPO 16 de mayo de 2024, pág. 18 líneas 11-15.
[133] TPO 16 de mayo de 2024, págs. 18 líneas 21-25; 19 líneas 1-2.

De entrada, debemos destacar que, tanto en el procedimiento administrativo del DACo como en la revisión judicial ante esta curia, el peso de la prueba por preponderancia de la evidencia recae sobre el doctor Báez Rivera. De conformidad con el alcance de nuestra revisión, la LPAUG dispone que las determinaciones de hechos de las decisiones de las agencias se sostendrán si se basan en evidencia sustancial que obra en el expediente administrativo. Al examinar minuciosamente los autos en su totalidad, es forzoso concluir que las inexorables determinaciones de hechos consignadas en la *Resolución* recurrida surgen de las declaraciones que prestaron los testigos y de la prueba documental admitida en evidencia. La constatación de que los enunciados fácticos del dictamen se apoyan enteramente en la prueba testifical y documental desfilada, así como la razonabilidad al valor probatorio de la evidencia, impide una intervención injustificada por parte de este foro intermedio en la determinación final del DACo.

Estimamos que el Recurrente no derrotó el valor probatorio que el foro impugnado confirió a los cheques cancelados, las facturas y las órdenes de compra que el Recurrido ofreció en evidencia. A pesar de las informalidades de algunos de los documentos, lo cierto es que las órdenes de compra, provenientes de libretas genéricas, cumplen esencialmente con los elementos de una factura, a saber: consignación de un suplidor, los artículos vendidos y su valor en el mercado. Tal como concluyó el foro impugnado, el que no gocen de formalidades, por ser manuscritas o incluso por presentar errores matemáticos, no equivale a su ilegalidad. Al fin y al cabo, el Recurrido declaró que él no fue quien las preparó y que no todos los suplidores operan de la misma forma. Además, el DACo le creyó y este foro intermedio está compelido a dar deferencia al juicio sobre credibilidad efectuado por el juzgador de hechos.

En cuanto a los aspectos técnicos del caso, si bien se presentó como evidencia el estudio del subsuelo, el Inspector aludió al mismo de manera general. El documento establece que el material de gran tamaño —definido como roca u otro material irreducible con una dimensión máxima mayor a 8 pulgadas— no se debe enterrar ni colocar en el relleno, a menos que la ubicación, los materiales y los métodos de colocación sean específicamente aceptados por el Consultor Geotécnico.[134] Añade que el material de relleno debe ser de la clasificación AASHTO A-2-4 o superior.[135]

En armonía, el Contratista destacó la importancia de utilizar relleno A-2-4. Sin embargo, fue enfático al establecer que el material del predio era muy rocoso, por lo que no se podía utilizar como relleno. Este dato es observable en las fotografías. Al respecto, el Recurrido apuntaló que, particularmente, en la construcción de los muros de *keystone*, se requería relleno con rocas de cuatro pulgadas o menos y que ello era innegociable. De lo contrario, las rocas podrían partir las mallas que se utilizan en la construcción de los muros con estos bloques, con el resultado de que, eventualmente, el muro podría fallar. Es decir, el Contratista no contradijo el estudio acerca de la calidad del subsuelo como relleno, pero distinguió el tipo de relleno a utilizar en un muro de contención del muro con bloque sedimentado. Toda vez que el inciso (i) del Artículo 1375 del Código Civil, *supra*, obliga al Contratista a "garantizar la solidez de la obra contra la ruina por el término de diez (10) años desde la entrega, cuando ésta se ha construido en un inmueble y deba tener larga duración", entonces, es a él a quien corresponde establecer las

---

[134] Véase Exhibit 14 en la copia certificada del expediente administrativo, Apéndice 2, Sección 3.2. Traducción nuestra: "Oversize material defined as rock, or other irreducible material with a maximum dimension greater than 8 inches, shall not be buried or placed in fill unless location, materials, and placement methods are specifically accepted by the Geotechnical Consultant".

[135] Véase Exhibit 14 en la copia certificada del expediente administrativo, Sección 4.4.4.

reglas del arte de la construcción. Claro está, este criterio, lejos de ser arbitrario, se deriva del aprendizaje y conversaciones entre el Recurrido y el ingeniero Morales, diseñador del muro. Decididamente, esta prueba oral no fue controvertida por el Recurrente durante el procedimiento administrativo.

Con relación al color del material extraído *vis a vis* el del relleno adquirido en las canteras, es nuestro criterio que esta característica, por sí sola, no debe ser considerada de manera absoluta como un factor determinante para distinguir uno u otro. Ciertamente del propio estudio del subsuelo se desprende que de las ocho perforaciones realizadas a distintas profundidades se generaron muestras de material de varios colores y características, tal como lo testificó el Recurrido.[136] No es irrazonable asumir que el material de relleno de la cantera en Gurabo tenga características similares al del predio en Caguas. Además, ni el foro impugnado ni este Tribunal deben descansar con exclusividad en las afirmaciones conclusivas sobre un grupo de fotografías puntuales, por parte de un Inspector ausente físicamente en el proyecto y cuyos cómputos se acomodan a la única factura que unilateralmente aprobó.

Hasta ahora, cuando se ha completado un 53% de la obra, el Contratista habría cobrado $155,988.24. Si incluimos la insatisfecha factura 4140 de 21 de junio de 2023 por $29,691.58, la suma asciende a $185,679.82. Esto es un 54% de lo convenido en el Contrato de $343,455.00. Nótese, además, que durante la inspección, el arquitecto Jorge Ortiz nunca ha señalado que la construcción de la obra incumple con lo expresado en el Permiso de Construcción otorgado ni con el diseño del muro. Tampoco se ha demostrado la existencia de modificaciones en la obra que incidan

---

[136] Véase Exhibit 14 en la copia certificada del expediente administrativo, Apéndice 1. Por ejemplo, brown, pale brown, dark brown, light olive brown, pale olive, olive brown, gray, light gray, olive gray, light olive gray, brownish yellow, yelowish brown, reddish yellow, reddish brown.

sobre el precio inicialmente pactado, según las cotizaciones y el acuerdo contractual aceptados por las partes. Con relación a la póliza de la CFSE, no se demostró la violación de ley alguna, puesto que el proyecto cuenta con la cubierta adecuada.

En fin, en el presente caso, el DACo descartó las alegaciones de la *Querella*. Sobre el crédito concerniente a la póliza de la CFSE, el Recurrente relevó al Contratista, éste le otorgó un crédito parcial y el propio doctor Báez Rivera atestiguó que el asunto estaba adjudicado, ya que se negoció. Acerca del crédito correspondiente al relleno y acarreo, el Recurrente no demostró la facturación indebida y el Recurrido otorgó un crédito por el material reutilizado. Así pues, procede confirmar la determinación administrativa impugnada.

### V.

Por los fundamentos expuestos, confirmamos la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda.  Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones